IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:00CR128 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| DONALD D. MUELLER, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on Donald Mueller's *pro se* Motion to Vacate Sentence and Conviction and Supplemental Petition for a Writ of Habeas Corpus, later filed by appointed counsel, pursuant to 28 U.S.C. § 2255 (hereinafter, collectively, "habeas corpus petition"). Filing Nos. 98 and 128. Mueller was tried and convicted of conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) & 846 and of use or possession of a firearm in connection with a drug trafficking offense in violation of 18 U.S.C. § 924(c). He was sentenced to two consecutive terms of incarceration of sixty months each.

Mueller asks the court to vacate or set aside the firearm offense conviction on the ground that the sentence was imposed in violation of the Constitution. He argues that he was deprived of his right to effective assistance of counsel under the Sixth Amendment in connection with his conviction on the firearm count. Mueller contends that his trial counsel was ineffective in failing to adequately challenge evidence that had arguably been obtained pursuant to an illegal search and seizure. He also asserts that his trial counsel was ineffective in failing to subpoena potential witnesses Kathy Killham and Jim McCuiston to testify at Mueller's trial. An evidentiary hearing on the petition was held on February 23, 2006. Filing No. 130.

## I. BACKGROUND

### A. The Underlying Conviction

Mueller was initially charged in an indictment with conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) & 846.  Filing No. 1.  The Government later filed a superseding indictment that charged that "on or about December 3, 1999, in the District if Nebraska, the defendant, DONALD D. MUELLER,  knowingly possessed, used, and carried a firearm  to wit: a Colt Mark IV .45 caliber handgun series 80, serial #FR13254E during and in relation to the commission of the crime of conspiracy to distribute and possession with intent to distribute methamphetamine . . . ."  Filing No. 35.

### 1.  Pretrial Proceedings

Mueller was represented at trial by Michael Decker.  The record shows that Decker initially moved for discovery and to suppress evidence obtained in the search of Mueller's home.  Filing Nos. 17 & 18.  Among the requested discovery items was a pawn ticket. Filing No. 17.  United States Magistrate Judge Kathleen Jaudzemis (hereinafter, "the magistrate") conducted a hearing on the motions on June 12, 2000.  Filing Nos. 23, Minutes; and 26, Transcript (hereinafter, "Suppression Hr'g Tr." ).  The court granted the motion for discovery, noting that the government had voluntarily produced the discovery. Filing No. 22; Suppression Hr'g Tr. at 3-4.

Decker challenged the warrant only on its face, contending that the affidavit submitted to support the warrant did not establish probable cause to search.  Filing No. 18; *see* Suppression Hr'g Tr. at 5 (noting that the motion involved review of the warrants "for probable cause on the four corners of the underlying affidavit and application").  The evidence adduced at the suppression hearing shows that the affidavit in support of the

warrant application was prepared and submitted by Lincoln County Deputy Sheriff Roland
Kramer. *See* Suppression Hr'g Tr. at 7-8; Filing No. 25, Exhibit List, Exhibit 1 ("Kramer
Aff."); *see also* Filing No. 98, Appendix of Evidence in Support of § 2255 Petition ("App.")
at 33-34. The warrant authorized a search of Donald Mueller's residence, 901 Hackberry,
North Platte, Nebraska for stolen guns and money. Suppression Hr'g Tr. at 8; App. at 38.

In the affidavit, Deputy Kramer states that a burglary had been reported by Mark
Dillon on October 21, 1999. Kramer Aff. at 1. Among the items reported stolen was a "Colt
M 1911 A1 45 Semi-auto pistol." *Id.* The affidavit then provides details of Deputy Kramer's
conversation with Steven R. Petersen on November 30, 1999. *Id.* at 1-2. Deputy Kramer
states in the affidavit that Petersen told Kramer that he had personal knowledge that
Donald Mueller's son, Danny, had  burglarized the Dillon home and had later sold the .45
automatic pistol. *Id.* Kramer also states that the information provided by Steven Petersen
appeared reliable. *Id.*

Kramer further avers in the affidavit that he had been informed on November 30,
1999, that Donald Mueller had pawned a .45 automatic at a North Platte pawn shop, that
the pawn ticket "described a gun identical to" the gun stolen in the Dillon burglary, and that
burglary victim Mark Dillon had identified the weapon pawned by Donald Mueller as the
weapon that had been stolen from his home. *Id.* at 2. Based on his investigation and on
facts that linked Danny Mueller to the Donald Mueller residence, Deputy Kramer concluded
that it was likely that items stolen in the Dillon burglary could be found at Donald Mueller's
house. *Id.* Based on the affidavit, the warrant was issued by Lincoln County District Judge
Kent Florin. Suppression Hr'g Tr. at 8-9; Hr'g Exhibit ("Ex.") 1; App. at 38.

Law enforcement officers, including Deputy Kramer, executed the warrant at Mueller's residence on December 3, 1999.  Suppression Hr'g Tr. at 11-12.  While conducting the search, the officers discovered contraband.  *Id.* at 4.  The officers then obtained another warrant to search for controlled substances.  *Id.* at 13-14.

At the close of the hearing, trial counsel commented that, because he had only recently been provided with the discovery items, "in reviewing . . . the particular pawn ticket, I think that a *Franks* issue has come up with respect to the affidavit."  Suppression Hr'g Tr. at 22.  He informed the court that a motion for a *Franks* hearing would "probably [be] coming down the line."  *Id.*

The magistrate made findings on the record that constituted her Report and Recommendation ("R&R").  *Id.* at 23-29.  The magistrate found that the "affidavit submitted to the judge in this case set forth sufficient probable cause for the issuance of the search warrant of defendant's residence."  *Id.* at 28.  Accordingly, the magistrate recommended denial of Mueller's motion to suppress.  *Id.*  This court adopted the magistrate's recommendation, over defendant's objection.  Filing No. 31.

The government later filed a superseding indictment adding the weapon charge. Filing No. 35.  Mueller's trial counsel never moved for a *Franks* hearing to challenge the warrant with respect to the new charge.  Plea negotiations were unsuccessful and the case proceeded to trial.

### 2.  Trial

Shortly before the trial commenced, the government indicated its willingness to afford Mueller an opportunity to enter a plea of guilty to the drug trafficking charge in exchange for dismissal of the weapon charge.  Filing No. 77, Trial Transcript ("Trial Tr.")

4

at 7-8.  Mueller declined.  *Id.* at 10.  Mueller also commented that there had been a Speedy Trial Act violation and indicated that he had urged his counsel to file a motion to dismiss on that ground.  *Id.*  The government responded that if a motion were filed it would refile the indictment.  *Id.* at 11.  The court indicated that it would entertain the motion, but informed the parties that generally such dismissals were issued without prejudice.  *Id.*  Mueller then waived speedy trial rights.  *Id.* at 21.

At trial, through the testimony of witnesses Sauna Howard, Tabrisio Martinez, Patrick Sanderson, and Kim Short, the government presented evidence that Mueller had bought and sold methamphetamine at various times in 1998 and 1999.  *Id.* at 45-63, 76-85, 96-117, 127-159.  Martinez, Sanderson, and Short all testified that they had entered pleas of guilty to drug-trafficking charges and testified against Mueller in hope of a sentence reduction for substantial assistance.  *Id.* at 84, 130, 101.  Howard testified pursuant to an agreement that the government would not prosecute her for a drug-trafficking offense.  *Id.* at 47, 70.  One of Mueller's neighbors, Brenda Brooks testified that she had observed suspicious activity that she believed to be drug-related at Mueller's residence and that she reported it to authorities.  *Id.* at 188.  She also testified that she had seen an unmarked police car in the neighborhood.  *Id.* at 189.

Tabrisio Martinez testified that he sold a half ounce of methamphetamine to Mueller for five hundred dollars in April or May of 1999.  *Id.* at 80.  He testified that he later met Mueller in his car, but that Mueller "didn't have no money, he had a gun that he wanted to trade me for methamphetamine."  *Id.*  at 81.  Martinez answered that he "couldn't do it for the gun but . . . could for money" and no methamphetamine was exchanged at that time.

*Id.* at 82.   Later, in July or August of 1999, Martinez sold approximately an ounce of methamphetamine to Mueller for one thousand dollars.   *Id.* at 82-83.

Patrick Sardeson testified that he saw Mueller on six or eight occasions between September 1999 and December 1999.   *Id.* at 107.   He testified that he sold approximately six ounces of methamphetamine to Mueller between October 1999 and December 1999. *Id.* at 111.   In September 1999, they met at Bill Cheevers's house and Cheevers sold an eight-ball (3.5 grams) of methamphetamine to Mueller.   *Id.* at 104-05.   In October 1999, Cheevers was arrested and Sardeson  began to distribute methamphetamine to Mueller. *Id.* at 108.   Sardeson   testified that he distributed methamphetamine in one-ounce quantities to Mueller on three occasions.   *Id.* at 110.   He further testified that he didn't believe he had ever seen Mueller with firearms, but he saw a bulge in Mueller's coat that he believed to be a handgun on two occasions "when [Mueller] was over at Cheerers' house."   *Id.* at 114.   Mueller never showed him a handgun of any type.   *Id.* at 115.   Mueller was over at Cheevers' house on at least one occasion after Cheevers was arrested.   *Id.* at 116.

Shauna Howard testified that she began working for Mueller in late 1994 in a motorcycle repair shop that Mueller owned.   *Id.* at 50.   Shortly thereafter, she began using methamphetamine with Mueller and he supplied her with the drug.   *Id.* at 51-53.   Mueller gave and sold methamphetamine to her on many occasions in 1998 and 1999.   *Id.* at 55-56.   During that time she bought between 25 and 50 grams of methamphetamine from Mueller.   *Id.* at 59-60.   the most Methamphetamine Mueller ever had on him at one time was "a couple of eight balls."   *Id.* at 60.   She testified that she owned a scale that had been seized in a search of Mueller's residence.   *Id.* at 54-55, 65-66.   She testified that Mueller would give her methamphetamine in half-gram or one-gram quantities in exchange for

letting him use her scale. *Id.* at 56. She stated that Mueller and others used her scale on occasion to ensure that they were not being cheated. *Id.* at 66. She also testified that he was known as a "gunsmith," he loaded weapons for himself and for other people, and participated in local "shoots," along with his son. *Id.* at 72. She testified that she had seen Mueller with a gun, and that he that "he always had it on him." *Id.* at 61. She testified he carried it in the "back of his pants." *Id.* at 150-51.

Kimberly Short testified that Mueller furnished her with methamphetamine in May and June 1999. *Id.* at 136. She paid him for it on some occasions and he gave it to her or shared it with her on others. *Id.* at137. She testified that she "fronted" Mueller some meth, meaning that she furnished the methamphetamine without his having to pay for it in advance, in the summer of 1999. *Id.* at 128. During that time she sold Mueller two to three ounces of methamphetamine altogether. *Id.* at 139. She stayed occasionally at Mueller's residence, and stored her belongings there, from September 1999 until she was arrested in December 1999. *Id.* at 140. During that time she saw him sell methamphetamine to several people at the residences of Jim McCuiston's, Lynette Cousins and Steve Richards. *Id.* at 141. Short also testified that she had seen Mueller in possession of a weapon and that he had it with him always. *Id.* at 150. She testified he would carry it in the front waistband of his pants. *Id.* at 150-51.

Lincoln County Sheriff John Davis testified that he and other officers executed a search of the home shared by Mueller and Kenneth Ginapp on December 3, 1999. *Id.* at 194-96. He testified that he found Mueller on the floor of his bedroom, with a weapon next to or under him. *Id.* at 197. The officers also found approximately three grams of methamphetamine on Mueller's person, and found drug paraphernalia, including a scale syringes, pipes and tubing, in the house. *Id.* at 213, 251. The weapon, the seized

methamphetamine and the drug paraphernalia were all admitted into evidence. *Id.* at 212, 217, 229, 231-34, 251; *see* Trial Exs. 2, 5, 7, and 8.

After the government rested its case, defense counsel indicated that two witnesses were to testify on Mueller's behalf. *Id.* at 258. The witnesses did not appear and did not testify, and they had not been served with a subpoena to appear. *Id.* at 266-68.

At the close of evidence, the court instructed the jury that the elements of the weapon charge included "knowingly and intentionally carrying a firearm during and in relation to the crime of conspiracy to distribute methamphetamine" and "that such carrying was carried out in furtherance of the conspiracy alleged in Count I." Filing No. 53, Jury Instructions, Instruction No. 28. During deliberations, the jury submitted the following question to the court, "Please clarify in furtherance of the conspiracy alleged in Count I." In answer to that query, without objection by counsel, the court responded: "The term 'in furtherance' of the conspiracy requires employment of the firearm to help forward, promote, advance, or progress the conspiracy by using, carrying, or possessing a firearm." Filing No. 51, Jury Question.

The jury found Mueller "guilty" on both counts. Filing No. 51, Verdict. He was sentenced to two consecutive sixty-month terms of imprisonment. Filing No. 65. His conviction was affirmed on appeal. *United States v. Mueller*, 18 Fed. Appx. 444 (8th Cir. 2001).

### B. Section 2255 Petition

Although Mueller raised the issue of ineffective assistance of counsel in his appeal, the Eighth Circuit Court of Appeals found the issue was properly the subject of a § 2255 action. *Id.* at 445. This is Mueller's first § 2255 petition. The petition is timely. *See* 28

U.S.C. § 2255 (prescribing one-year period of limitation from the date the judgment and conviction is final).[1]

In his habeas corpus petition, Mueller asserts that his counsel at trial was ineffective in failing to subpoena certain witnesses and in failing to move for a hearing under *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978), to challenge the search warrant in connection with the weapon charge.  Mueller does not challenge his drug-conspiracy conviction.  He contends that the government secured his conviction on the weapon charge with evidence obtained in an unconstitutional search and seizure.  He argues that the affidavit submitted by Deputy Kramer to support the warrant contained material omissions of fact.  He further argues that trial counsel's ineffectiveness prejudiced him because he can show that he would not have been convicted on the weapons charge without evidence obtained in the illegal search.

Trial counsel Michael Decker testified at the evidentiary hearing on Mueller's petition.  Deputy Kramer's affidavit as well as the Lincoln County Police Report prepared in connection with the Dillon burglary were offered and admitted into evidence at the hearing.  *See* Filing No. 132, Exhibit List, Hr'g Ex. 1 ("Kramer Aff.") & 2 ("police report"). additional documentary evidence had been submitted in connection with the petition.  *See* App. at 10-11 (newspaper articles showing that Steven Petersen had been arrested for burglary shortly before Deputy Kramer spoke to him on November 30, 1999); Filing No. 129, government's response with attachments (Kenneth Ginapp state court file).

Decker testified that he had seen the police report before the suppression hearing and knew that several facts included in the police report had been omitted from Deputy

---

[1]Mueller's judgment and conviction became final on March 11, 2002, when his petition for certiorari was denied by the Supreme Court.  Filing No. 96.  His habeas corpus petition was filed on September 11, 2002.

Kramer's affidavit.  The police report shows that Mark Dillon told police that the .45 caliber weapon stolen from his home had certain identifying characteristics: an Ithaca receiver, Packmeier grips, and Dillon's Social Security number etched in white paint under the grips. Hr'g Ex. 2 at 5.  A supplemental entry made by Sergeant M.L. Dye on the day the burglary was reported shows that Mark Dillon's son, Steve, stated that he had heard that Steven Petersen said that Pat Bay had tried to sell Petersen a .45 automatic weapon.  *Id.* at 2.

In an entry dated November 30, 1999, Deputy Kramer wrote that he had spoken to Steven Petersen who advised that "Domingo Carrizales a/k/a Chico Carrizales and Danny Mueller burglarized Mark Dillon's home; Danny Mueller had the AR-15 in his possession and sold the .45 automatic to someone; Steve Dillon loaned his father's 357 to Steven Petersen; Steven Petersen's home was burglarized and the guns were stolen; and Pat Bay took the guns from Steve Petersen's home."  Hr'g Ex. 2 at 17.  Significantly, the last three listed facts were omitted from Deputy Kramer's affidavit.

Michael Decker also testified that he was familiar with the case of *Franks v. Delaware*, under which a defendant is entitled to a hearing to challenge the veracity of the affidavit on a showing of deliberate falsity or reckless disregard for the truth by the affiants. He admitted that although he had challenged the face of the affidavit, he did not move for a *Franks* hearing.  He testified that he could not recall why he did not move for a *Franks* hearing other than that he did not think it would be successful.  He further testified that he did not look at any state court records, did not hire an investigator and did not inquire whether Steven Petersen had ever been charged with a crime.

Decker acknowledged that the gun charge had not yet been filed when he moved to suppress the evidence obtained in the search.  He did not file a new motion to suppress or move for a *Franks* hearing after the superseding indictment was filed.  He testified that

he was also familiar with Kenneth Ginapp, who had been arrested with Mueller.  He knew that Ginapp had been charged in state court but did not know that Ginapp's attorney had moved for and obtained a *Franks* hearing on the same warrant.  He acknowledged that the gun charge was based on items seized in the search and he knew it at the time of trial.

Importantly, Decker conceded that he should have filed a motion for a *Franks* hearing to contest the warrant application.  He testified that he assumed there would be no need for a *Franks* hearing because plea negotiations were proceeding and he thought the government would drop the gun charge.  He testified he became aware that defendant was not going to plead guilty a few days before the trial, but still did not move for *a Franks* hearing.

With respect to the witnesses who did not appear to testify on Mueller's behalf, Decker related that, although he had moved for issuance of subpoenas to compel the appearance of Kathy Killham and Jim McCuiston at trial, he neglected to request that the United States Marshals serve the subpoenas.  He stated that he believed that the witnesses would pick up their subpoenas when they came to testify.  Neither witness appeared to testify and they could not be located at the time of trial.  Decker stated that he did not believe that either witness would have helped Mueller's case.

Michael David Gooch also testified at the habeas corpus hearing.  He is an attorney in private practice in Omaha, Nebraska, who has specialized in criminal defense.  His testimony related to the standard of professional care for criminal defense attorneys in the Omaha community at the time of Mueller's trial.  He testified that, in order to determine the necessity of a *Franks* hearing, a reasonably competent defense attorney would compare the information contained within the four corners of the affidavit to the police reports and

other evidence that would have been available to officers at the time.  If there were any discrepancy, a competent attorney would at least investigate.  He further stated that to obtain a *Franks* hearing, counsel would have to make a preliminary showing that the application for the warrant was misleading because of deliberate or reckless actions of the officers.

Gooch testified that he reviewed the materials in evidence and concludes that the representation of Mueller fell below the standards of reasonable competence.  He reviewed the materials that were available to trial counsel at the time of Mueller's trial.  He noted that the police report contains numerous relevant facts that were omitted from Deputy Kramer's affidavit.  The significant omitted facts include information about what was taken and what was not taken from the Dillon house and the facts that there had been no forced entry and there were dogs at the Dillon residence.  The police report also contained information that tended to show that the relationship between Mark Dillon and his son Steve was strained.  Mark Dillon had described a gun with his Social Security number etched in white, an identifying feature that could be easily verified but was not.  Most importantly, the affidavit did not contain the critical information that Steve Dillon had reported that Steven Petersen had told him that Pat Bay had been trying to sell guns, including a .45.  Also omitted was the information that Steven Petersen had also stated that Steve Dillon had lent him a gun.

In addition, other facts that were known to or should have been known by Deputy Kramer, are relevant.  Gooch testified that whether or not Deputy Kramer had actual knowledge, he should have known the information that was in the police report that had been furnished by other officers.  Significantly, Deputy Kramer knew or should have known that Steven Petersen had been arrested and charged with three armed robberies and one

burglary on November 27, 1999.  In fact, he would have been in custody at the time he made the statement to Deputy Kramer implicating the Muellers.   The record also shows that although the weapon described on the pawn ticket may be similar to Mark Dillon's description of the stolen gun, it is not identical.  Deputy Kramer could easily have verified the identity of the pawned weapon by removing the handle and checking whether a Social Security number was etched in white below the cover, but he failed to do so.

Gooch testified that these omitted facts were important because they tended to show that Steven Petersen was a more likely suspect as the perpetrator of the burglary than Danny Mueller would have been.  The facts show that Steven Petersen should not have been regarded as a reliable informant, but as a suspect with a motive to lie.  The fact that he was in custody when he implicated the Muellers casts further doubt on his veracity.

Gooch testified that, in his opinion, knowledge of these facts would have made a difference in a court's review of the application for a warrant.  Absent the foregoing information, a logical chain connects the Dillon burglary to Donald Mueller's pawning of a gun several weeks later.  If the foregoing omitted information had been included in the affidavit, however, the causal link between the burglary and Donald Mueller is significantly attenuated, and the evidence instead implicates Steven Petersen, in collaboration with Steve Dillon and Pat Bay.  Gooch characterized the affidavit as it was written as "mind-bogglingly misleading."

In Gooch's opinion, a competent attorney practicing in Nebraska in 1999 would have investigated and would have moved for a *Franks* hearing under the circumstances.  Gooch testified that failure to have done so amounts to incompetence unless there was a countervailing tactical reason for the action.  He further testified that the only tactical

13

reasons he could envision were that Mueller's attorney might not want to cast aspersions on Deputy Kramer for fear that other charges might be filed, or because plea negotiations were ongoing. Once plea negotiations had ended, and it became clear that Mueller wanted to go to trial, the only defense tactic would have been to challenge the warrant and the only way to have challenged the warrant was by way of a *Franks* hearing.

## II.  DISCUSSION

The Sixth Amendment guarantees that an accused shall have "the Assistance of Counsel for his defense." U.S. Const. Amend. VI. To show ineffective assistance of counsel, petitioner must first show that counsel's performance was deficient; he must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 669 (1984). Next, he must show that he has been prejudiced by counsel's deficient performance. *Id.* The focus is on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Claims of ineffective assistance of trial counsel are properly raised in proceedings under 28 U.S.C. § 2255. *See, e.g., United States v. Smith*, 62 F.3d 1073, 1078 (8th Cir. 1995).

"Ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice, with performance being measured against an 'objective standard of reasonableness' 'under prevailing professional norms.'" *Rompilla v. Beard,* 545 U.S. 374, —, 125 S. Ct. 2456, 2462 (2005) (*quoting Strickland*, 466 U.S. at 687-88) (citations omitted). "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time'

investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.'" *Id.* (*quoting Strickland*, 466 U.S. at 689, 691)(citations omitted).  In evaluating whether counsel's performance fell below an objective standard of reasonableness, the court must examine "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688.  The court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  Accordingly, a defendant must overcome the presumption that counsel's challenged action "might be considered sound trial strategy." *Id.*

To establish the prejudice prong of the *Strickland* test, the petitioner must show a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Rompilla*, 545 U.S. at —, 125 S. Ct. at 2467 (*quoting Strickland,* 466 U.S. at 694).   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Prejudice is shown by demonstrating that counsel's errors were so serious that they rendered the proceedings fundamentally unfair or the result unreliable.  *Bucklew v. Luebbers,* 436 F.3d 1010, 1016 (8th Cir. 2006)(*citing Lockhart v. Fretwell*, 506 U.S. 364, 372 (1994)).  The ultimate focus of the *Strickland* inquiry is always on the "fundamental fairness of the proceeding whose result is being challenged."  *Strickland*, 466 U.S. at 696.  More specifically, "[t]o show prejudice, [the defendant] must show a reasonable probability that absent the alleged errors of counsel he would have been found not guilty."  *United States v. Robinson*, 301 F.3d 923, 925 (8th Cir. 2002).

"Under *Franks v. Delaware,* 438 U.S. 154 (1978)], if an officer omits critical information from a search warrant application and obtains a warrant, the resultant search may be unreasonable under the Fourth Amendment." *United States v. Stropes,* 387 F.3d 766, 771 (8th Cir. 2004). In order to obtain a *Franks* hearing, a defendant must make a substantial preliminary showing of a false or reckless statement or omission and must also show that the alleged false statement or omission was necessary to the finding of probable cause. *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002). To prevail on a *Franks* claim based on omissions of fact, a defendant must prove, first, that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and, second, that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause. *Stropes,* 387 F.3d at 771 (stating that the defendant must show that the alleged omissions would have made it impossible to find probable cause). Evidence of an informant's credibility may sometimes be critical to a finding of probable cause. *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998).

A mandatory minimum consecutive sentence of five years is required if a person is convicted of using or carrying a firearm <u>during and in relation to</u> a drug trafficking crime or who possesses a firearm <u>in furtherance of</u> a drug trafficking crime. 18 U.S.C. § 924(c)(1)(A)-(A)(i) (emphasis added). An earlier version of the statute had criminalized using and carrying a weapon during and in relation to a drug trafficking crime, but not mere possession. *See* 18 U.S.C. § 924(c)(1997). Congress amended Section 924(c)(1) in 1998 to add the proscription against possession of a firearm in furtherance of a drug trafficking crime. *See* Act of Nov. 13, 1998, Pub. L. 105-386, § 1(a), 112 Stat. 3469; 18 U.S.C. § 924(c)(1) (2000); *McNeal v. United States,* 249 F.3d 747, 750 n.3 (8th Cir. 2001). The

16

amendment was adopted in response to the Supreme Court's interpretation of the term "use" in the statute to mean active employment, not mere possession. *United States v. Bailey,* 516 U.S. 137, 148 (1995). "Active employment includes brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire, a firearm." *Id.* at 148.

The legislative history of the 1998 amendment, however, expressly clarifies that the addition of "possession" to the statute was not intended to cover every possession of a firearm by one who also is a drug trafficker. *United States v. Iland*, 254 F.3d 1264, 1271 (10th Cir. 2001). Instead, the government must clearly show that a firearm was possessed to advance or promote the commission of the underlying offense. *Id.* Accordingly, section 924(c) has been held to criminalize two distinct offenses: (1) using or carrying a firearm during and in relation to a drug trafficking crime, and (2) possessing a firearm in furtherance of a drug trafficking crime. *See United States v. Gamboa*, 439 F.3d 796, 810 (8th Cir. 2006). Implicit in a finding that a defendant "used and carried" firearms is a finding that he simultaneously "possessed" the firearms (because it would not be possible for him to use and carry firearms without also possessing them). *Id.* The "during and in relation to" element requires that the firearm "furthered the purpose or effect of the crime and its presence or involvement was not the result of coincidence." *See Smith v. United States*, 508 U.S. 223, 238 (1993). These limiting words in the statute make the statute applicable "only where a defendant 'carries' a gun both 'during and in relation to' a drug crime." *Muscarello v. United States*, 524 U.S. 125, 137 (1998)(emphasis in original) (also noting that "Congress added these words in part to prevent prosecution where guns 'played' no part in the crime"). The phrase "in relation to" means, at a minimum, that the firearm must

17

have some purpose or effect with respect to the drug trafficking crime. *Smith,* 508 U.S. at 238.

The term "furtherance" as used in section 924(c) should be given its plain meaning, "[t]he act of furthering, advancing, or helping forward." *United States v. Reyes,* 362 F.3d 536, 543 (8th Cir. 2004) (internal citations omitted). The "in furtherance of" language requires a higher standard of participation than the "during and in relation to" language. *Gamboa,* 439 F.3d at 810. "A finding that a defendant possessed a firearm 'in furtherance of' a drug-trafficking crime requires a showing of something more than possession 'during and in relation to' a drug trafficking crime." *Id.* Simultaneous possession of drugs and firearms is not alone sufficient to support a conviction under section 924(c). *United States v. Urkevich,* 408 F.3d 1031, 1037 (8th Cir. 2003). Evidence of a nexus between the defendant's possession of the firearm and the drug offense is required. *Id.* Factors that help distinguish different types of firearm possession and determine whether a particular defendant's possession "furthers, advances, or helps forward" a drug trafficking offense include the type of drug activity that is being conducted, the accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found. *United States v. Ceballos-Torres*, 218 F.3d 409, 414-15 (5th Cir. 2000).

The Sentencing Guidelines, on the other hand, provide a two-level sentence enhancement for possession of a firearm by a drug offender that can be applied on a lesser showing than that required under section 924(c). *See* U.S.S.G. § 2D1.1(b)(1) & cmt. n.3; *United States v. De Leon Ruiz*, 47 F.3d 452, 454 (1st Cir. 1995) (noting difference in

18

standard of proof).   To warrant the enhancement, the Government must only show at sentencing that a weapon "was present and that it is not clearly improbable that the weapon was connected with the criminal activity."   *United States v. Belitz,* 141 F.3d 815, 817 (8th Cir. 1998) (*citing United States v. Vaughn*, 111 F.3d 610, 616 (8th Cir. 1997), applying U.S.S.G. § 2D1.1, cmt. n.3).   A showing of spatial and temporal proximity between the weapon, the defendant, and drugs and drug paraphernalia will satisfy this standard. *United States v. Bost*, 968 F.2d 729, 732 (8th Cir. 1992).   *Id.* at 818.   Moreover, constructive possession is enough to satisfy the standard and the fact that a defendant may have an innocent reason for obtaining the gun is not controlling.   *Belitz, 141 F.3d at 818.*   Nonetheless, even under the Guidelines, the presence of a firearm, without more, is an insufficient predicate for a § 2D1.1(b)(1) enhancement.   *United States v. Savage,* 414 F.3d 964, 966 (8th Cir. 2005).   *See also* U.S.S.G. § 2D1.1,cmt. n.3 ("For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.").

### III.  Analysis

Applying those standards to the facts presented in this case, the court finds that defendant Mueller has shown that his trial counsel's failure to challenge the veracity of the affidavit supporting the warrant amounted to a denial of his constitutional right to effective assistance of counsel.   Mueller has shown that Mr. Decker's representation fell below reasonable professional standards.   The inconsistencies between the police report and the affidavit would have caused a reasonably competent attorney to move for a *Franks* hearing.   Those inconsistencies present a substantial preliminary showing that Deputy Kramer's affidavit either recklessly disregarded the truth, or was intended to mislead the

court.  The evidence that would have been presented at a *Franks* hearing, which was available to Mr. Decker before trial, would have shown that law enforcement officers deliberately or recklessly omitted material facts in the affidavit.

If the material facts had been included, the affidavit would not have provided probable cause to search Donald Mueller's house.  Deputy Kramer's  representation that Steven Petersen was a reliable informant, rather than a suspect with a motive to lie, is especially significant to this analysis.[2]   The omitted facts reveal that Mueller was only peripherally connected, if at all, to the burglary.  If the affidavit had included the relevant omitted information, Mueller's link to the offense would have been diminished, if not negated.  Accordingly, the court finds it probable that Mueller's motion to suppress would have been granted if a *Franks* hearing had been held.[3]

 The court further finds that Mueller has shown prejudice as a result of counsel's errors.  Mueller was charged with a weapon offense that requires the government to prove that the defendant was using or carrying a weapon "during and in relation to" a drug crime or possessing the specific weapon "in furtherance of" a drug crime.  18 U.S.C. § 924(c). Without the evidence obtained in the search, a showing that Mueller's use, carrying or possession of guns was connected to the drug trafficking activity is significantly diminished. There is no evidence that Mueller ever brandished or actively employed a weapon. Shauna Howard's and Kim Short's testimony that Mueller carried guns "all the time" was

---

[2]Also, the evidence adduced at trial shows that law enforcement officers had been informed of suspicious drug activities at the residence and were perhaps looking for a reason to search the premises.

[3]It is not necessary to reach the question of whether Mr. Decker's failure to present the testimony of favorable witnesses also violated Mueller's Sixth Amendment rights.  It is not seriously disputed that trial counsel's failure to subpoena witnesses fell below standards of reasonable representation.  Although the absence of such testimony, on its own, may not have been sufficient to prejudice Mueller, the court notes that this additional oversight weighs in on the prejudice calculus.

vague, noncommital and contradictory.  Although the jury was free to credit the testimony, the evidence generally shows a connection between the weapon and Mueller's drug use, but does not prove the requisite link between the weapon and Mueller's drug trafficking activities.

Evidence of Mueller's purpose for possessing the guns is lacking without the inference that the jury could draw from the evidence retrieved in the search.  Several witnesses denied that Mueller used guns for protection and denied knowledge of any burglaries or break-ins at Mueller's residence.  Moreover, there was evidence that Mueller was a "gunsmith," who worked on and repaired guns and participated in "shoots." Evidence that Mueller carried guns all or most of the time tends to negate the assumption that the purpose of the guns was to further the purpose or effect of the drug crime, especially in view of Mueller's proclivity for weapons and shooting.  The principal evidence of gun involvement that from which a juror could infer that the weapons furthered or helped forward or had a purpose or effect with respect the drug trafficking was the contemporaneous presence of weapons, drugs, and drug paraphernalia in close proximity to each other at the time of the search.  Without that evidence, it is reasonably probable that Mueller would have been acquitted of the 924(c) charge. [4]

The court notes that this case involved the seizure of only a small quantity of drugs. The evidence that Mueller distributed amounts over what could be characterized as a "user quantity" was thin.  Absent the evidence of a weapon in the presence of tools of the drug trade in the Ginapp/Mueller residence, it is reasonably probable that the jury would have

---

[4]This is not to say that the evidence, even without that obtained in the search, would not have been sufficient to support a conviction on that count.  The deferential sufficiency of evidence standard is not at issue.  The issue is whether there is a reasonable probability that the result would have been different had counsel not erred.

found that although Mueller may have used, bought, or sold methamphetamine in the presence of guns, his carrying of or possession of guns was not "in furtherance of" or "during <u>and</u> in relation to" his drug-trafficking activities.  The evidence shows that Mueller, although undoubtedly a user, was probably a minor player in the drug conspiracy.  The testimony of witnesses who were more significant players was that Mueller had at times bought small quantities of drugs from them, not that he sold it to them or to others.  All of the evidence of drug trafficking was furnished by co-conspirators who had been offered "deals" in exchange for their testimony.  Although the jury is of course free to credit such testimony, the court notes that the testimony was not compelling.

Significantly, while deliberating, the jury submitted a question to the court on the meaning of "in furtherance of," showing that it struggled with the issue of the connection or link between the drug trafficking and the weapon.  If this were an issue for the jury even on the evidence presented, the court finds it reasonably probable that the jury would not have found Mueller "guilty" on the gun charge if the evidence from the search had been excluded.  Although mere evidence of possession temporally and spatially linked to drugs may be sufficient to warrant imposition of a weapon enhancement under the Guidelines, it does not meet the more stringent requirement that the evidence prove Mueller's possession of the gun *furthered* drug trafficking or his carrying of the gun was *during and in relation to* drug-trafficking that is required to secure a conviction under section 924(c).  Having opted to prosecute the statutory gun charge in an apparent attempt to secure the mandatory minimum consecutive sentence for Mueller, as opposed to seeking a guideline sentencing enhancement of shorter duration, the government is at least obligated to prove

22

the elements of its charge.  The court finds it reasonably probable that the government could not have done so without the evidence uncovered in the search.

In order to grant a writ of habeas corpus the court must find that a petitioner has shown a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *See Rompilla*, 545 U.S. at —, 125 S. Ct. at 2467.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.   Petitioner has done so.  Based on its familiarity with the trial and its review of the evidence submitted in connection with the petition, this court's confidence in the outcome of the proceeding has been undermined.

THEREFORE, IT IS ORDERED:

1.  Mueller's Petition for a writ of habeas corpus (Filing Nos. 98 and 128) is granted.

2.  Petitioner's judgment and conviction on Count II of the Superseding Indictment is vacated.

3.   The Bureau of Prisons is directed to release Mueller when he has fully served his sentence on Count I and to recalculate his release date in accordance with this opinion.

DATED this 27th day of September, 2006.

BY THE COURT:


s/ Joseph F. Bataillon                                      
Chief U.S. District Judge

23